Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAMHITA GERA and DENISH BHAVSAR, derivatively on behalf of IOVANCE BIOTHERAPEUTICS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> FREDERICK G. VOGT, JEAN-MARC BELLEMIN, IGOR P. BILINSKY, DANIEL G. KIRBY, IAIN DUKES, ATHENA COUNTOURIOTIS, RYAN MAYNARD, WAYNE ROTHBAUM, MICHAEL WEISER, and WENDY L. YARNO, <br><br> Defendants, <br><br> and <br><br> IOVANCE BIOTHERAPEAUTICS, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br><br> <u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u> |

## INTRODUCTION

Plaintiffs Samhita Gera and Denish Bhavsar ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of nominal defendant Iovance Biotherapeutics, Inc. ("Iovance" or the "Company"), file this Verified Shareholder Derivative Complaint against defendants Frederick G. Vogt ("Vogt"), Jean-Marc Bellemin ("Bellemin"), Igor P. Bilinsky ("Bilinsky"), Daniel G. Kirby ("Kirby"), Iain Dukes ("Dukes"), Athena Countouriotis ("Countouriotis"), Ryan Maynard ("Maynard"), Wayne Rothbaum ("Rothbaum"), Michael Weiser ("Weiser"), and Wendy L. Yarno ("Yarno") (collectively, the "Individual Defendants," and together with Iovance, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Iovance, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against Defendants Vogt, Bellemin, Bilinsky, and Kirby for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Iovance, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 9, 2024 through May 8, 2025, inclusive (the "Relevant Period").

2.    Iovance is a Delaware-incorporated commercial-stage biopharmaceutical

company that focuses on the development and commercialization of cell therapies using autologous tumor infiltrating lymphocytes ("TIL"), purportedly for the treatment of metastatic melanoma and other solid tumor cancers. The Company's key product is Amtagvi, a tumor-derived autologous T cell immunotherapy developed to treat adult patients with unresectable or metastatic melanoma previously treated with a PD-1 blocking antibody, and if BRAF V600 mutation positive, a BRAF inhibitor with or without a MEK inhibitor. The Company received FDA approval for Amtagvi on February 16, 2024 and commercially launched Amtagvi on February 20, 2024.

3.    The Company also markets Proleukin, an interlukin-2 ("IL-2") product used in the Amtagvi treatment regimen and in other applications. Treatments are conducted at authorized treatment centers ("ATCs") in the United States, with regulatory approvals purportedly anticipated in both the United Kingdom and Canada in 2025.

4.    Despite these promising ventures, during the Relevant Period, the Individual Defendants continuously and materially created the false impression that Iovance possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also minimizing risks associated with seasonality and macroeconomic fluctuations. For example, on May 9, 2024, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2024 and an update on recent developments (the "Q1 2024 Press Release").

5.    The Q1 2024 Press Release touted the Company's financial results. Indeed, in discussing the Amtagvi launch, the Q1 2024 Press Release stated, in relevant part:

> Frederick Vogt, Ph.D., J.D., Interim President and Chief Executive Officer of Iovance, stated, "The first quarter of 2024 was transformative for Iovance following our fist FDA approval and our **strong start for the U.S. commercial launch**[1] of Amtagvi™ for patients with advanced melanoma. Immediate demand for Amtagvi is very high and continues to significantly increase across initial ATCs. As of today, more than 100 patients have already enrolled for Amtagvi therapy. We have successfully manufactured and delivered

---

[1] All emphasis has been added unless otherwise noted herein.

Amtagvi to many ATCs where commercial patients are being treated. ***We expect our launch momentum to remain strong and continue to build as we ramp up the U.S. launch throughout 2024 with the authorization of additional ATCs. We also continue to execute across our broad clinical pipeline***. As a fully integrated company, Iovance is well positioned to remain the global leader in innovating, developing, and delivering TIL cell therapy for patients with cancer.

6.     Additionally, the Q1 2024 Press Release touted the purported success of the Company's onboarding of ATCS, stating: "***Onboarding is complete at more than 40 U.S. ATCs, up from 30 initial ATCs at approval. Iovance remains on track to onboard approximately 50 ATCs by the end of May 2024 and experts have more than 70 ATCs onboarded by the end of 2024***." The press release also discussed anticipated revenues, stating that "***[t]he U.S. launch of Amtagvi, and additional sales of Proleukin® used with the treatment regimen, are expected to drive significant revenue for Iovance in 2024***."

7.     However, these rosy representations failed to disclose, *inter alia*, that the new ATCs were experiencing longer timelines to begin treating patients with Amtagvi and that, as a result, the Company was unlikely to be able to achieve the revenues and meet the guidance it had previously announced to investors during the Relevant Period.

8.     The truth fully emerged on May 8, 2025, after the market closed, when the Company released its first quarter 2025 financial results, reporting a quarterly total product revenue of $49.3 million, a noteworthy decline from the prior quarter's $73.7 million. Iovance also announced its full fiscal year 2025 total product revenue guidance, which reduced the previous prediction of $450-$475 million to $250-$300 million, over 40% at the midpoint. The Company also stated its intent to revise its full-year guidance to reflect the recent launch dynamics of Amtagvi.

9.     On this news, the price of the Company's stock fell $1.42 per share, or approximately 44.8%, from a closing price of $3.17 per share on May 8, 2025 to close at $1.75 per share on May 9, 2025.

10.    During the Relevant Period, the Individual Defendants breached their

fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the new ATCs were experiencing longer timelines to begin treating patients with Amtagvi; (2) the Company's sales team and new ATCs were ineffective in patient identification and patient selection for Amtagvi, leading to higher patient drop-offs; and (3) the foregoing dynamics led to higher costs and lower revenue because ATCs could not keep pace with manufactured product. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11.     Moreover, one of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider trading while the Company's stock was artificially inflated as a result of the Individual Defendants' false and misleading statements discussed herein, reaping personal profits of approximately $503,000.

12.     In light of the Individual Defendants' misconduct—which has subjected the Company and its Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), Chief Operating Officer ("COO"), and Chief Commercial Officer ("CCO") to two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Vogt's, Defendant Bellemin's, Defendant Bilinsky's, and Defendant Kirby's liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

16.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

17.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    Venue is proper in this District because Iovance's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

19.    Plaintiffs are current shareholders of Iovance. Plaintiffs have continuously held Iovance common stock at all relevant times.

**Nominal Defendant Iovance**

20.    Iovance is a Delaware corporation with its headquarters at 825 Industrial Road, Suite 100, San Carlos, California 94070. Iovance's common stock trades on The Nasdaq Stock Market LLC ("NASDAQ") under the ticker symbol "IOVA."

**Defendant Vogt**

21.    Defendant Vogt has served as the Interim CEO and President of the Company since June 2021. He has also served as the General Counsel of Iovance since July 2017 and as a Company director since June 2024. In addition, Defendant Vogt serves as a member of the Scientific Committee.

22.    For the fiscal year ended December 31, 2024 (the "2024 Fiscal Year"), Defendant Vogt received $10,953,193 in total compensation from the Company. This included $730,060 in salary, $9,969,063 in stock awards, $237,270 in non-equity incentive plan compensation, and $16,800 in all other compensation.

23.    The Schedule 14A the Company filed with the SEC on April 28, 2025 (the "2025 Proxy Statement") stated the following about Defendant Vogt:

- Joined Iovance in September 2016

- Has led the Company's construction of the Iovance Cell Therapy Center, acquisition of Proleukin®, and approval and launch of Amtagvi

- Previously practiced law at the international firm of Morgan, Lewis & Bockius LLP, focusing on intellectual property and business law in the life sciences and representing clients in patent strategy, transactional, and litigation matters

- Served in numerous scientific, management, and legal roles of increasing responsibility over a period of 13 years at GlaxoSmithKline, where he primarily focused on oncology and cardiovascular drug development

- Received a B.S. in Chemistry from Ursinus College, a Ph.D. in Chemistry from the Pennsylvania State University, and a J.D. from Temple University

**Defendant Bellemin**

24.    Defendant Bellemin has served as the Company's CFO since December 2020.

25.    For the 2024 Fiscal Year, Defendant Bellemin received $3,247,940 in total compensation from the Company. This included $551,238 in salary, $2,557,873 in stock awards, $124,029 in non-equity incentive plan compensation, and $14,800 in all other compensation.

26.    The 2025 Proxy Statement stated the following about Defendant Bellemin:

- Previously served as Executive Vice President of Finance and Chief Financial Officer of Gritstone Oncology, Inc., a publicly traded company developing cancer immunotherapies, from January 2018 to November 2020

- Served as Senior Vice President, Market Access, Business Solutions and Services of Actelion Pharmaceuticals US Inc., a commercial biotechnology company, from January 2008 to December 2017

- Received a two-year university degree in economics, a master's degree in finance from Université Paris Dauphine, a postgraduate degree in finance and accounting from Université Paris II Panthéon-Assas and an M.B.A. from the ESSEC Business School in Paris, France

**Defendant Bilinsky**

27.    Defendant Bilinsky has served as the Company's COO since March 2021.

28.    For the 2024 Fiscal Year, Defendant Bilinsky received $3,247,940 in total compensation from the Company. This included $551,238 in salary, $2,557,873 in stock awards, $124,029 in non-equity incentive plan compensation, and $14,800 in all other compensation.

29.    The 2025 Proxy Statement stated the following about Defendant Bilinsky:

- Has more than 20 culminative leadership experience through prior roles as Chief Executive Officer, Chief Operating Officer, and Chief Business Officer at companies within the life sciences industry

- Prior to joining the Company, served as Chief Business Officer of Oncternal Therapeutics, Inc., from September 2019 to March 2021

- Received a B.S. in physics from the Mocow Institute of Physics and Technology and a Ph.D. in physics from the Massachusetts Institute of Technology

**Defendant Kirby**

30.    Defendant Kirby has served as the Company's CCO since February 2025.

31.    The 2025 Proxy Statement stated the following about Defendant Kirby:

- Led global commercial strategy and operations for an emerging cell therapy platform of products as CCO of Orca Bio
- Served as CCO at Omeros Corporation from 2018 to 2020, overseeing the U.S. and EU launch readiness for narsoplimab targeting complications post hematopoietic stem cell transplantation as well as commercial activities

**Defendant Dukes**

32.    Defendant Dukes has served as Chairman of the Board since August 2016. He also serves as Chair of the Nominating and Corporate Governance Committee.

33.    For the 2024 Fiscal Year, Defendant Dukes received $2,618,992 in total compensation from the Company. This included $90,000 in fees earned or paid in cash and $2,528,992 in deferred restricted stock unit awards.

34.    The 2025 Proxy Statement stated the following about Defendant Dukes:

- Currently is a Venture Partner at OrbiMed Advisors LLC and the CEO of Eilean Therapeutics LLC
- Served as Senior Vice President and Head of Business Development and Licensing for Merck Research Laboratories from August 2013 to May 2016
- Holds M.J. and Doctor of Philosophy degrees from the University of Oxford, a M.S. degree in Cardiovascular Studies from the University of Leeds and a Bachelor of Science degree in Pharmacology from the University of Bath

**Defendant Countouriotis**

35.    Defendant Countouriotis has served as a Company director since June 2019.

She also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

36.    For the 2024 Fiscal Year, Defendant Countouriotis received $1,329,492 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $1,264,492 in deferred restricted stock unit awards.

37.    The 2025 Proxy Statement stated the following about Defendant Countouriotis:

- Serves as the co-founder and Chief Executive Officer of Avenzo Therapeutics, a private biotechnology company focused on oncology
- Was the President and Chief Executive Officer and a board member of Turning Point Therapeutics from 2018 until it was acquired by Bristol-Myers Squibb in August 2022
- Serves on the board of directors at BioMarin and Passage Bio, and privately held biotechnology companies Capstan Therapeutics, Leal Therapeutics and Recludix Therapeutics
- Holds an undergraduate degree from the University of California, Los Angeles and an M.D. from the Tufts University School of Medicine. She received training at the University of California, Los Angeles and at the Fred Hutchinson Cancer Research Center in the Pediatric Hematology-Oncology Program

**Defendant Maynard**

38.    Defendant Maynard has served as a Company director since February 2015. He also serves as the Chair of the Audit Committee.

39.    For the 2024 Fiscal Year, Defendant Maynard received $1,329,492 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $1,264,492 in deferred restricted stock unit awards.

40.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Maynard made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| November 12, 2024 | 50,000 | $10.06 | $503,000 |

Thus, in total, before the fraud was exposed, Defendant Maynard sold 50,000 shares of Company stock on inside information, for which he received approximately $503,000 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

41.    The 2025 Proxy Statement stated the following about Defendant Maynard:

- Served as Chief Financial Officer of Cara Therapeutics, Inc., a publicly traded commercial-stage biopharmaceutical company, LetsGetChecked, Blade Therapeutics, Inc., a privately held biotechnology company, Rigel Pharmaceuticals, Inc., a public commercial-stage drug development company, and Rigel

- Holds a B.S. in Commerce - Accounting from Santa Clara University

**Defendant Rothbaum**

42.    Defendant Rothbaum has served as a Company director since June 2016. He also serves as a member of the Compensation Committee and Scientific Committee.

43.    For the 2024 Fiscal Year, Defendant Rothbaum received $1,919,000 in total compensation from the Company. This included $240,000 in fees earned or paid in cash and $1,679,000 in deferred restricted stock unit awards.

44.    The 2025 Proxy Statement stated the following about Defendant Rothbaum:

- Founded and serves as president of Quogue Capital, a single-family office private equity fund focused on investing and supporting small to midcap life sciences companies

- Co-founded and was the Executive Chairman of Acerta Pharma, a private life sciences company he later sold to AstraZeneca. Acerta's lead drug, Calquence® (acalabrutinib) was approved by the FDA for mantle cell lymphoma in 2017 and chronic lymphocytic leukemia in 2020, and also co-founded Kartos Therapeutics following the in-license

of an investigational MDM2 inhibitor from Amgen and Telios Pharma after licensing a novel targeted therapy from Merck KGaA to treat selected blood cancers and ophthalmology diseases

- Taken a leadership role in transforming the Company, restructuring and reorganizing our Board of Directors, senior management and overall clinical operations and strategy, and he is the Company's largest shareholder

- Graduated Phi Beta Kappa from Binghamton University in 1990 with a dual major in political science and psychology and received his MA in international economics from The George Washington University

**Defendant Weiser**

45.    Defendant Weiser has served as a Company director since March 2018. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee, Nominating and Corporate Governance Committee, and Scientific Committee.

46.    For the 2024 Fiscal Year, Defendant Weiser received $2,423,992 in total compensation from the Company. This included $320,000 in fees earned or paid in cash and $2,103,992 in deferred restricted stock unit awards.

47.    The 2025 Proxy Statement stated the following about Defendant Weiser:

- Founded and has been a principal of Actin Biomed LLC, a healthcare investment firm focused on the discovery and development of novel treatments, since 2006

- Served as the chairman of the board of directors of Chelsea Therapeutics International, Ltd., a development stage pharmaceutical company that was acquired by H. Lundbeck A/S in 2014, served on the board of directors of Ziopharm Oncology, Inc., a publicly traded biopharmaceutical company focused on immunotherapies in oncology, and served on the board of directors of Emisphere Technologies, Inc., a pharmaceutical and drug delivery company

- Holds a B.A. in Psychology from the University of Vermont, received his M.D. from New York University School of Medicine and completed his Ph.D. in Molecular Neurobiology at Cornell University Medical College

**Defendant Yarno**

Verified Shareholder Derivative Complaint

48.    Defendant Yarno has served as a Company director since June 2023. She also serves as a member of the Audit Committee.

49.    For the 2024 Fiscal Year, Defendant Yarno received $902,242 in total compensation from the Company. This included $57,500 in fees earned or paid in cash and $844,742 in deferred restricted stock unit awards.

50.    The 2025 Proxy Statement stated the following about Defendant Yarno:

- Had a 26-yar long career at Merck & Co., Inc. in commercial and human resource positions of increasing seniority, such as Executive Vice President and Chief Marketing Officer

- Currently serves on the board of directors of publicly traded life sciences companies Ideaya Bio, Inc., Tarsus Pharmaceuticals, Inc., and Inovio Pharmaceuticals, Inc., and she formerly served on the boards of St. Jude Medical, Inc., MyoKardia, Inc., Medivation, Inc., Global Blood Therapeutics, Inc., Aratana Therapeutics, Inc., Alder Biopharmaceuticals, Inc. and Durata Therapeutics, Inc., prior to their acquisitions.

- Received a B.S. in Business Administration from Portland State University and an M.B.A. from Temple University

### FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

51.    By reason of their positions as officers, directors, and/or fiduciaries of Iovance and because of their ability to control the business and corporate affairs of Iovance, the Individual Defendants owed Iovance and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Iovance in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Iovance and its shareholders so as to benefit all shareholders equally.

52.    Each director and officer of the Company owes to Iovance and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair

dealing.

53.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Iovance, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

54.    To discharge their duties, the officers and directors of Iovance were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Iovance, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

56.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its

regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

57.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Iovance were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Iovance's corporate governance and applicable codes of conduct and/or ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Iovance conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Iovance and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Iovance's operations would comply with all applicable laws and Iovance's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be

accurate;

        (f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

        (g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

        (h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.    Each of the Individual Defendants further owed to Iovance and the shareholders the duty of loyalty requiring that each favor Iovance's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

59.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Iovance and were at all times acting within the course and scope of such agency.

60.    Because of their advisory, executive, managerial, directorial, and controlling positions with Iovance, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

61.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Iovance.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62.    In committing the wrongful acts alleged herein, the Individual Defendants

Verified Shareholder Derivative Complaint

have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

63.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

64.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Iovance was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

65.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the

wrongdoing.

66.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Iovance and was at all times acting within the course and scope of such agency.

## IOVANCE'S CODE OF CONDUCT

67.    Iovance's Code of Business Conduct and Ethics (the "Code of Conduct") represents that "[a]ll of [the Company's] directors, officers and employees must conduct themselves accordingly and seek to avoid even the appearance of improper behavior."

68.    The Code of Conduct states that the Company's business is "based on mutual trust, honesty and integrity in all of [its] affairs, both internally and externally."

69.    In the section "Honesty and Integrity," the Code of Conduct states, in relevant part:

> Each of us must be truthful in our business dealings with each other, and with our auditors, legal counsel, regulators and loan review and compliance staffs. Illegal, dishonest and fraudulent acts are grounds for termination. Making false statements or otherwise misleading internal or external auditors, attorneys, regulators or loan review and compliance personnel is prohibited. You must never withhold or fail to communicate fully information that is requested in connection with an appropriately authorized investigation or review. Any concealment of information is a violation of your employment agreement, which may result in termination of your employment with the Company and could constitute a criminal act.

70.    In the section "Protecting Corporate Assets," the Code of Conduct states, in relevant part:

> Company assets must not be used for personal benefit. The Company's assets include, but are not limited to, all of its properties, including intellectual properties, business information, cash, and securities. Misappropriation of Company assets is a violation of your employment agreement, which may result in termination of your employment with the Company and could constitute a criminal act.

71.    In the section "Accuracy of Company Records and Reports," the Code of

Conduct states, in relevant part:

> The Company is committed to maintaining records, data and information that
> are accurate and complete so as to permit the company to make timely and
> accurate disclosures to its regulators and to its stockholders. You are
> personally responsible for the integrity of the information, reports and records
> under your control. Records must be maintained in sufficient detail so as to
> reflect accurately the Company's transactions and activities. Our financial
> statements must be prepared in accordance with generally accepted
> accounting principles ("GAAP") and fairly present, in all material respects,
> the financial condition and results of the Company. To accomplish full, fair,
> and accurate reporting, you must ensure that financial reports issued by the
> Company are timely, accurate, understandable, and complete.
>
> Business records and communications often become public, and we should
> avoid exaggeration, derogatory remarks, guesswork, or inappropriate
> characterizations of people and companies that can be misunderstood. This
> applies equally to text messages, e-mail, internal memos, and formal reports.
> Records should always be retained or destroyed according to the Company's
> record retention policies. In accordance with those policies, in the event of
> litigation or governmental investigation, please consult the Company's
> internal legal counsel, or if internal counsel is not available, then the
> Company's outside legal counsel.

72.    In the section "Compliance with Laws, Regulations and Company Policies
and Procedures," the Code of Conduct states, in relevant part:

> The Company's activities shall always be in full compliance with applicable
> laws and regulations. Further, all employees of the Company must have an
> understanding of and comply with the Company's policies and procedures.
> When such laws, regulations or Company policies are ambiguous or difficult
> to interpret, you should seek advice from the Company's internal legal
> counsel, or if internal counsel is not available, then from the Company's
> outside legal counsel.

73.    In the section "Conflicts of Interest," the Code of Conduct states, in relevant
part:

> You must conduct your private, business, and personal activities in a manner
> that avoids conflict with, or even the appearance of conflict with, your ability
> to act solely in the interests of the Company. A conflict of interest arises if

you have interests of any nature that compromise your ability to act objectively and in the best interests of the Company . . . At no time may you, on behalf of the Company, transact personal business, the business of an immediate family member, or the business of a for profit entity in which you or a member of your immediate family has an interest . . . with the Company. In all such situations, you must disqualify yourself from involvement with any transaction or relationship between that person and the Company.

Conflicts of interest are prohibited as a matter of Company policy.

74.    In the section "Disclosure of Potential Conflicts of Interest," the Code of Conduct states, "You shall immediately disclose to a majority of disinterested members of the Board of Directors of the Company, or an applicable committee thereof, all situations that possess a potential for conflict of interest."

75.    In the section "Insider Trading" the Code of Conduct states, in relevant part:

You must at all times comply with all laws and regulations concerning insider trading, as well as comply with the Company's Insider Trading Policy. In general, you are prohibited (whether or not you are an "insider") by applicable law from trading in the securities of any company while in possession of material, non-public information (also known as "insider information") regarding that company. This prohibition applies to the Company's securities as well as to the securities of other companies, including the Company's customers and suppliers, and to transactions for any account of the Company, client account or personal account. The Company's Insider Trading Policy applies to every employee of the Company and extends to activities within and outside their duties at the Company . . . Furthermore, insider trading can result in the imposition of civil and criminal penalties under United States federal and state law.

76.    In the section "Misleading Statements, the Code of Conduct states, in relevant part: "You should make every effort not to make false or misleading remarks about suppliers, customers, or competitors, or their products or service."

77.    In the section "Waiver of the Code of Ethics," the Code of Conduct states:

All employees, officers and directors are obliged to follow the provisions of the Code. Generally, waivers will not be granted, and exceptions will be made only for good cause. Any waiver of this Code for officers or directors may be

made only by the Board of Directors of the Company or an applicable committee thereof.

78.   In the section "Compliance and Reporting Allegations of Misconduct," the Code of Conduct states:

> The Company is committed to actively preventing violations of the law, Company policies, and this Code. Reports of actual or suspected violations may be made to an employee's immediate manager, Human Resources, or the Company's internal legal counsel, and through the confidential website or hotline, which is managed by an independent third party, using the instructions and information provided in the Company's Whistleblower Policy. If a potential violation is reported via the confidential website or hotline, employees may choose to submit complaints anonymously. Reported matters will be promptly investigated. Employees are expected to cooperate in internal investigations of misconduct when requested to do so. The reporter will be informed when matters are closed, however, outcomes from investigations may not always be clear to those involved due to confidentiality concerns.

79.   In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Moreover, one of the Individual Defendants violated the Code of Conduct by engaging in insider trading, netting proceeds of approximately $503,000. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

**IOVANCE'S AUDIT COMMITTEE CHARTER**

80.    Iovance also maintains a Charter of the Audit Committee of the Boad of Directors of Iovance Biotherapeutics, Inc. (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee:

> The principal purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of Iovance Biotherapeutics, Inc. (the "Company") is to oversee the integrity of the Company's financial reporting processes, audit, and financial statements. In particular, the Committee shall monitor (a) the integrity of the Company's accounting and financial reporting processes; (b) the Company's compliance with legal and regulatory requirements as related to financial reporting; (c) the qualifications, independence, and performance of the Company's independent registered public accounting firm, referred to herein as the "independent auditors," including determining whether to engage or dismiss the independent auditors; and (d) the performance of the Company's internal audit function, if any. The Committee shall also prepare the report required by the U.S. Securities and Exchange Commission (the "Commission") to be included in the Company's annual proxy statement.

> . . .

> In discharging its oversight role, the Committee is granted the power to investigate any matter brought to its attention with full access to all books, records, facilities, and personnel of the Company and the power to retain and determine funding for, at the Company's expense, independent legal counsel, additional independent auditors, or other experts and advisors for this purpose. The Company shall provide the Committee with appropriate funding to perform its duties, including payment of the Company's independent auditors and any experts or advisors retained by the Committee.

> The Company's independent auditors are ultimately accountable to the Committee, and the independent auditors shall report directly to the Committee. The Committee shall have sole and direct authority and responsibility to select, hire, oversee, evaluate, approve the compensation of, and, where appropriate, replace the Company's independent auditors (subject, if applicable, to stockholder ratification of the selection of the independent auditors). The Committee shall also have sole and direct authority and responsibility to select, hire, oversee, evaluate, approve the compensation of, and, where appropriate, replace any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing

other audit, review, or attest services for the Company.

81.    Under the heading "Key Functions and Responsibilities," in a subsection titled "Financial Statement and Disclosure Matters," the Audit Committee Charter states the following, in relevant part:

1.    Review and discuss with management and the Company's independent auditors the Company's annual audited financial statements (including the related notes), including disclosures made in management's discussion and analysis, and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

2.    Review and discuss with management and the Company's independent auditors the Company's quarterly financial statements (including the related notes) prior to the filing of its Form 10-Q, including the results of the independent auditors' review of the quarterly financial statements.

3.    Review and discuss matters required to be discussed pursuant to the Public Company Accounting Oversight Board (the "PCAOB") Auditing Standard No. 1301 "Communications with Audit Committees" and other applicable requirements of the PCAOB and the Commission as well as the form of audit opinion to be issued by the independent auditors on the financial statements.

4.    Discuss with management and the Company's independent auditors significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including any significant changes in the Company's selection or application of accounting principles, the quality and adequacy of the Company's internal controls, and any special steps adopted in light of material deficiencies in such controls.

5.    Review and discuss quarterly reports from the independent auditors on: (a) all critical accounting policies and practices to be used; (b) all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors; (c) other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences; and (d) conformance with auditing standards.

6.    Review and discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP

information, as well as financial information and earnings guidance provided to analysts and rating agencies.

7. Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk assessment and risk management policies, and discuss with management any off-balance sheet transactions, arrangements, or obligations in which the Company has an interest.

8. Review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification and disclosure process for reports on Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

82.    Under the same heading, in a subsection titled "Compliance Oversight Responsibilities" the Audit Committee Charter states the following, in relevant part:

1. At the conclusion of each audit, obtain from the Company's independent auditors' assurance that the independent auditors are not required to report to the Company under Section 10A(b) of the Exchange Act any illegal act.

2. Approve or reject proposed related party transactions. Obtain reports from management that the Company and its employees are in compliance with applicable legal requirements and the Company's Code of Conduct.

3. Keep the Company's independent auditors informed of the Committee's understanding of the Company's relationships and transactions with related parties that are significant to the Company; and to review and discuss with the Company's independent auditors the auditors' evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties.

4. At least once each calendar year, review with management the Company's (a) material investor relations, public relations, and stock promotion firms to confirm that there are no relationships between any of those firms and any of the Company's officer or directors, and (b) compliance with all other policies and procedures the Company has adopted or enacted regarding (i) the Company's dealings with investor relations, public

relations, and stock promotion firms, and (ii) public communications about the Company or its securities, including such communications at any time that the Company is "in registration."

5. Establish procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

6. Discuss with management and the Company's independent auditors any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

7. Discuss with the Company's General Counsel and/or outside counsel any legal matters that may have a material impact on the financial statements or the Company's compliance policies.

8. Discuss with the independent auditor the matters required to be discussed by applicable auditing standards relating to the conduct of the audit, including any difficulties encountered in the course of the audit work and management's response, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management as well as resolution of those disagreements.

9. Discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

83. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the

Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## FALSE AND MISLEADING STATEMENTS

### May 9, 2024 Press Release

84.    On May 9, 2024, the Company issued a press release reporting its financial results for the first quarter ended March 31, 2024 (the "Q1 2024 Press Release"). The Q1 2024 Press Release provided an update on the Company's recent developments and touted Iovance's financial statements, boasting of the Company's purported "strong momentum" with respect to its launch of Amtagvi, including as it pertained to "onboarding" ATCs. The press release stated, in relevant part:

**Iovance Biotherapeutics Reports First Quarter 2024 Financial Result and Corporate Updates**

*Strong Momentum for Amtagvi™ (Lifileucel) U.S. Launch Following U.S. Food and Drug Administration (FDA) Approval*

*100+ Amtagvi Patients Enrolled Across More Than 40 Current Authorized Treatment Centers*

*(ATCs), with ~50 Total ATCs on Track by the End of May and 70+ Total ATCs by Year-End 2024*

*                    *                    *

Fredrick Vogt, Ph.D., J.D., Interim President and Chief Executive Officer of Iovance, stated, "The first quarter of 2024 was transformative for Iovance following our first FDA approval and our ***strong start for the U.S. commercial launch*** of Amtagvi™ for patients with advanced melanoma. Immediate demand is very high and continues to significantly increase across initial ATCs. As of today, more than 100 patients have already enrolled for Amtagvi therapy. We have successfully manufactured and delivered Amtagvi to many ATCs where commercial patients are being treated. ***We expect our launch momentum to remain strong and continue to build as we ramp up to***

*the U.S. launch throughout 2024 with the authorization of additional ATCs. We also continue to execute across our broad clinical pipeline.* As a fully integrated company, Iovance is well positioned to remain the global leader in innovating, developing, and delivering TIL cell therapy for patients with cancer."

85.    Further, with respect to Amtagvi's U.S. approval, specifically as it pertained to ATCs, the press release discussed the following, in relevant part:

**Recent and First Quarter 2024 Highlights and Corporate Updates**

Amtagvi™ (Lifileucel) U.S. Approval and Launch Highlights in Advanced Melanoma

- The U.S. FDA approved Amtagvi (lifileucel) on February 16, 2024, as the first treatment option for advanced melanoma after anti-PD-1 and targeted therapy. Amtagvi is also the first and only FDA-approved T-cell therapy for a solid tumor indication.

- Since approval, more than 100 patients have enrolled for Amtagvi therapy. The first patients have been successfully treated and the balance are moving through the stages of the journey, which includes surgery for cell collection, manufacturing, and the Amtagvi treatment regimen.

- ***Onboarding is complete at more than 40 U.S. ATCs, up from 30 initial ATCs at approval. Iovance remains on track to onboard approximately 50 ATCs by the end of May 2024 and expects to have more than 70 ATCs onboarded by the end of 2024.***

- Manufacturing turnaround time has been on-target with initial launch expectations of approximately 34 days from inbound to return shipment to ATCs. The commercial manufacturing experience to date is consistent with prior clinical experience.

- ***The U.S. launch of Amtagvi, and additional sales of Proleukin® used with the treatment regimen, are expected to drive significant revenue for Iovance in 2024.***

***May 9, 2024 Form 10-Q***

86.    Also on May 9, 2024, the Company filed its quarterly report on Form 10-Q

with the SEC for the period ended March 31, 2024, affirming the previously reported financial results (the "Q1 2024 10-Q"). The Q1 2024 10-Q was signed by Defendants Vogt and Bellemin and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Vogt and Bellemin attesting to the accuracy of the Q1 2024 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

87.    The Q1 2024 10-Q stated the following regarding "factors that *may* cause actual results, levels of activity, performance or achievements to be materially different from the information expressed" including Iovance's "ability to successfully commercialize Amtagvi." In particular, the Q1 2024 10-Q stated the following, in relevant part:

> These statements involve risks, uncertainties and other factors that *may* cause actual results, levels of activity, performance or achievements to be materially different from the information expressed or implied by these forward-looking statements.
>
> *            *            *
>
> - our ability to successfully commercialize Amtagvi™ (lifileucel) and Proleukin® (aldesleukin), and other products and/or product candidates for which we have obtained FDA, EMA, or other regulatory approvals;
>
> *            *            *
>
> ***Successfully commercialize our lead project Amtagvi™ for the treatment of post-anti-PD-1 advanced melanoma***
>
> Our top priority is commercialization of Amtagvi™ in the U.S. for the treatment of patients with post-anti-PD-1 advanced melanoma, for which we received FDA approval on February 16, 2024. We have experienced marketing, payer access and distribution teams as well as a sales force with extensive experience in oncology and cell therapy. Our medical affairs team is also in the field educating key opinion leaders, or KOLs, about Amtagvi™ and TIL cell therapy, as well as presenting and publishing our clinical results.

More than half of the members of our field teams have prior cell therapy experience.

The four primary areas of our Amtagvi™ launch efforts include:

- onboarding of authorized treatment centers, or ATCs, for commercial launch with the goal of activating 50 ATCs within 90 days of the BLA Prescription Drug User Fee Act Date of February 24, 2024;

- collaboration with healthcare professionals, or HCPs, who will be administering our product;

- operational excellence in launch execution, commercial manufacturing and delivery of therapy; and

- ongoing and continuous communication with payors about the value of Amtagvi™.

***August 8, 2024 Press Release***

88.    On August 8, 2024, the Company issued a press release reporting Iovance's financial results for the quarter ended June 30, 2024 and providing an update on recent events (the "Q2 2024 Press Release"). The Q2 2024 Press Release touted Iovance's financial results, again reported on the purported "strong momentum" for Amtagvi, and issued fiscal 2025 guidance. In particular, the press release reported the following, in relevant part:

**Iovance Biotherapeutics Reports Financial Results and Corporate Updates for Second Quarter and First Half 2024**

***Strong Momentum Continues for Amtagvi™ (Lifileucel) U.S. Launch with $31.1 Million in Total 2Q24 Revenue***

***Total Product Revenue Guidance*** *of $53-$55 Million for 3Q24, $160-$165 Million for FY24, and **$450-$475 Million for FY25***

\*              \*              \*

Frederick Vogt, Ph.D., J.D., Interim President and Chief Executive Officer of Iovance stated, "The first half of 2024 ushered in our first FDA approval and the start of our U.S. commercial launch of Amtagvi™ for patients with

previously treated advanced melanoma. Amtagvi and Proleukin® ***demand remains strong and continues to increase as authorized treatment centers (ATCs) adopt Amtagvi*** and community referral networks are mobilized to drive patients to ATCs. These demand trends, ***as well as broader utilization of Amtagvi among an expanding ATC network, are expected to accelerate quarterly growth throughout this year and next yar.*** We expect this growth to continue in 2025, 2026 and beyond. Additionally, we continue to expand our global commercial footprint, proprietary manufacturing capabilities, and broad clinical pipeline. As a fully integrated company, Iovance is well positioned to remain the global leader in innovating, developing, and delivering TIL cell therapy for patients with cancer.

**Second Quarter and First Half 2024 Financial Results, Corporate Guidance, and Updates**

**Product Revenue and Guidance**

- **2Q24 Total Product Revenue:** $31.1 million for the second quarter ended Jun 30, 2024, following initial launch of Amtagvi on February 20, 2024.

  - **Amtagvi Revenue:** 2Q24 represents the first quarter of Amtagvi sales in the U.S. with product revenue of $12.8 million, which is only recognized upon patient infusion.

  *            *            *

- **FY24 and FY25 Total Product Revenue Guidance:** Iovance expects significant quarter-over-quarter growth in product revenue to continue throughout 2024, 2025, and beyond as the adoption curve for Amtagvi steepens. More than 55 patients have been infused with Amtagvi since the first commercial infusion in April 2024, which includes 25 patients infused in the second quarter and over 30 patients infused since the start of the third quarter.

  *            *            *

  - **Revenue Guidance in FY25:** Robust growth for Amtagvi continues as existing ATC demand increases and new ATCs are onboarded. ***As such, total product revenue for 2025 is anticipated to be within the range of $450 to $475 million, the first full calendar year of Amtagvi sales,*** with gross margins expected to increase greater than 70% over the next several years. In line with Amtagvi demand, Proleukin revenue is expected to significantly increase in 2025.

  *            *            *

**Amtagvi (Lifileucel) U.S. Launch Highlights in Advanced Melanoma**

- The U.S FDA approved Amtagvi (Lifileucel) on February 16, 2024, as the first treatment option for advanced melanoma after anti-PD-1 and targeted therapy. Amtagvi is also the first FDA approved T cell therapy for a solid tumor indication.

- ***Onboarding is complete at more than 50 U.S. ATCs across 29 states and more than 90% of addressable patients are now located within 200 miles of an ATC. More than 70 ATCs remain on track to be onboarded by the end of 2024.***

- Manufacturing turnaround time has been on-target with initial launch expectations of approximately 34 days from inbound to return shipment to ATCs, with efforts underway to reduce the turnaround time in the near term. The commercial manufacturing experience is consistent with prior clinical experience.

89.    The same day, the Company hosted an earnings call to discuss the financial results. Interim CEO, Defendant Vogt, reiterated the Company's fiscal 2025 guidance during the call, stating, in pertinent part:

> Turning back to launch momentum. This afternoon's press release. We also introduced revenue guidance for the third quarter of full year 2024 and for 2025. This guidance is based upon our ongoing experience and confidence in the strong uptake and significant quarter-over-quarter growth in the Amtagvi demand and corresponding Proleukin sales for the foreseeable future. We used our visibility to the growth rate of infusions, adoption across our ATC network, manufacturing capacity and additional launch dynamics to prepare this guidance.
>
> . . .
>
> For full year 2025, the first calendar year of our U.S. launch first full calendar yar over U.S. launch, we expect significant year-over-year growth driven by scale-up in existing and new ATCs and robust community referral networks contributing to additional demand. As a result, we anticipate total product revenue will increase to $450 million to $475 million in the full year of 2025.
>
> In 2026 and beyond, Amtagvi and Proleukin are expected to continue to drive

significant additional revenue growth. Thes products repent more than $1 billon peak opportunity in the U.S. market in the currently approved indication alone. Future revenue growth drivers also include a wider geographic footprint for Amtagvi in previously treated advanced melanoma as well as U.S. and global label expansions to the front line advanced melanoma, non-small cell lung cancer and other indications as we'll discuss later in the call.

### August 8, 2024 Form 10-Q

90.    Also on August 8, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2024 (the "Q2 2024 10-Q"). The Q2 2024 10-Q was signed by Defendants Vogt and Bellemin and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Vogt and Bellemin attesting to the accuracy of the Q2 2024 10-Q and that "this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

91.    The Q2 2024 10-Q purportedly reported the Company's net product revenue for the period, representing Amtagvi sales and "factors that *may* cause actual results, levels of activity, performance or achievements be materially different from the information expressed" including Iovance's "ability to successfully commercialize Amtagvi." In particular, the Q2 2024 10-Q stated, in pertinent part:

> These statements involve risks, uncertainties and other factors that *may* cause actual results, level of activity, performance or achievements to be materially different from the information expressed or implied by these forward-looking statements.
>
>     *       *       *
>
> - Our ability to successfully commercialize Amtagvi™ (lifileucel) and Proleukin® (aldesleukin), and any other products and/or product candidates or which we obtain or have obtained FDA, EMA, or other regulatory approvals;

### November 7, 2024 Press Release

92.    On November 7, 2024, the Company issued a press release announcing its financial results for the quarter ended September 30, 2024 (the "Q3 2024 Press Release"). The Q3 2024 Press Release touted Iovance's financial results and ATC onboardings and reaffirmed guidance of "$450-$475M for FY25 of Total Product Revenue." The Q3 2024 Press Release reported, in relevant part:

**Iovance Biotherapeutics Reports Financial Results and Corporate Updates for Third Quarter and Year to Date 2024**

*Significant Demand for Amtagvi™ (Lifileucel) Continues with $58.6M in Total 3Q24 Product Revenue*

***Reaffirming Guidance of $160-$165M for FY24 and $450-$475M for FY25 of Total Product Revenue***

\*                    \*                    \*

Frederick Vogt, Ph.D., J.D., Interim President and Chief Executive Officer of Iovance, stated, "Iovance is executing a successful U.S. commercial launch of Amtagvi™ for patients with previously treated advanced melanoma. ***Robust demand for Amtagvi and Proleukin® continues to grow as our expanding network of authorized treatment centers (ATCs) and outreach to community oncologists broaden the utilization of Amtagvi, driving a higher volume of patient referrals.*** Demand trends are expected to accelerate growth throughout the remainder of the year and over the following years. As such, we are actively pursuing additional regulatory approvals to expand our commercial footprint, driving growth beyond the U.S. into new markets with a high prevalence of advanced melanoma. As a fully integrated company, Iovance is well positioned to remain the global leader in innovating, developing, and delivering current and future generations of TIL cell therapy for patients with cancer."

**Third Quarter Updates and Year to Date 2024 Financial Results, Corporate Guidance and Updates**

**Product Revenue and Guidance**

• **3Q24 Total Product Revenue:** Iovance recognized total revenue of $58.6

million from sales of Amtagvi and Proleukin during the third quarter ended September 30, 2024.

> o **Amtagvi Revenue:** Product Revenue was $42.1 million from U.S. Amtagvi sales in the third quarter of 2024, reflecting increasing strong demand and adoption. The Amtagvi launch, with revenue recognized upon patient infusion, began during the second quarter of 2024.

> o **Proleukin Revenue:** Product revenue also included $16.5 million of Proleukin sales in the third quarter of 2024. Proleukin is used in the Amtagvi treatment regimen and other commercial and clinical settings. Proleukin revenue is recognized upon delivery to distributors and ATCs and purchased several months in advance of anticipated infusions an Amtagvi revenue recognition.

*          *          *

- **FY24 and FY25 Total Product Revenue Guideline:** Amtagvi adoption is on track to continue accelerating, driven by broader utilization, higher demand from our expanding ATC network, and growth in community referrals. Iovance is reaffirming its guidance for FY24 and FY25 and expects quarter-over-quarter product revenue growth for the fourth quarter of 2024, full year 2025, and beyond.

*          *          *

- **Revenue Guidance in FY25:** Total product revenue remains on track to be within range of $450 to $475 million in 2025, the first full calendar year of Amtagvi sales. Gross margins are increasing as the launch advances and are expected to surpass 70% over the next several years. In line with anticipated growth in Amtagvi demand, Proleukin revenue is also expected to increase significantly in 2025 and beyond.

*          *          *

**Amtagvi (Lifileucel) U.S. Launch Highlights in Advanced Melanoma**

- The U.S. FDA approved Amtagvi (lifileucel) on February 16, 2024, as the

34

first treatment option for patients with advanced melanoma after anti-PD-1 and targeted therapy. Amtagvi is the first FDA approved T cell therapy for a solid tumor indication.

- ***Onboarding is complete at 56 U.S. ATCs across 29 states and more than 90% of addressable patients are now located within 200 miles of an ATC. Approximately 70 ATCs remain on track to be onboarded by the end of 2024.***

- Manufacturing turnaround time has been on target, with launch expectations of approximately 34 days from inbound to return shipment with ATCs. With efforts underway, turnaround time is expected to be reduced in the near term. The commercial manufacturing experience is consistent with prior clinical experience.

93.    The same day, Iovance hosted an earnings call with analysts and investors to discuss its third quarter financial results. During the call, Defendant Vogt further elaborated on Iovance's expectations for fiscal 2025, stating, in relevant part:

We also reiterate our full year 2025 guidance of $450 million in total product revenue. We expect a significant increase in year-over-year growth as ATC's broaden utilization and new ATCs as well as community referral networks contribute to additional demands.

. . .

With a fully integrated infrastructure and growing interest in Amtagvi outside the U.S., Iovance is well positioned to continue scaling globally. Our ex-U.S. teams are being built and regulatory dossiers are under review, submitted our plans across multiple international markets with potential or our first ex-U.S. approval in first half of 2025. European Medicines Agency validated and accepted our marketing authorization application, or MAA, for a review for all EU member states with potential approval in the second half of 2025. The Medicines and Healthcare Products Regulatory Agency in the United Kingdom is reviewing a separate MAA submission for potential approval in the first half of 2025.

Our new drug submission is also underway for near-term submission in Canada and will include a prioritized review process for potential approval in mid-2025. Additional regulatory dossiers remain on track for submission in Australia and Switzerland in 2025, and we'll target additional markets with

1    highly concentrated populations of advanced melanoma patients in the future.

2    ***November 7, 2024 Form 10-Q***

3    94.    Also on November 7, 2024, the Company filed its quarterly report on Form

4    10-Q with the SEC for the third quarter of the 2024 Fiscal Year (the "Q3 2024 10-Q"). The

5    Q3 2024 10-Q was signed by Defendants Vogt and Bellemin and attached SOX

6    certifications signed by Defendants Vogt and Bellemin attesting to the accuracy of the Q3

7    2024 10-Q and that "this report does not contain any untrue statement of a material fact or

8    omit to state a material fact necessary to make the statements made, in light of the

9    circumstances under which such statements were made, not misleading with respect to the

10   period covered by this report."

11   95.    The Q3 2024 10-Q reaffirmed the previously reported financial results,

12   purported to report the Company's net product revenue for the period, and presented sales

13   of Amtagvi and "factors that ***may*** cause actual results, levels of activity, performance or

14   achievements be materially different from the information expressed" including Iovance's

15   "ability to successfully commercialize Amtagvi." In particular, the Q3 2024 10-Q stated,

16   in pertinent part:

17
18       These statements involve risks, uncertainties and other factors that ***may*** cause
         actual results, level of activity, performance or achievements to be materially
19       different from the information expressed or implied by these forward-looking
         statements.
20

21               *                          *                          *

22   •   Our ability to successfully commercialize Amtagvi™ (lifileucel) and
23       Proleukin® (aldesleukin), and any other products and/or product
         candidates or which we obtain or have obtained FDA, EMA, or other
24       regulatory approvals, including by the European Commission in the
         European Union, or the EU;
25

26   ***February 27, 2025 Press Release***

27   96.    On February 27, 2025, the Company issued a press release, reporting its fourth

28   quarter and full-year fiscal 2024 results and again reaffirming its fiscal 2025 guidance (the

"Q4 2024 Press Release"). The Q4 2024 Press Release touted Iovance's financial results, including the purported progress of ATC growth trajectories, and reaffirmed the fiscal 2025 product revenue guidance. The press release stated, in pertinent part:

**Iovance Biotherapeutics Reports Financial Results and Corporate Updates for Fourth Quarter and Year to Date 2024**

*Significant Demand for Amtagvi™ (Lifileucel) Continues with Total Product Revenue of $73.7M in 4Q24 an $164.1M in FY24, Achieving Upper End of FY24 Guidance Range of $160M-$165M*

**Reaffirming Total Product Revenue Guidance of $450-$475M**

\*                    \*                    \*

Frederick Vogt, Ph.D., J.D., Interim President and Chief Executive Officer of Iovance, stated, "***In 2024, we successful drove strong early adoption for our U.S. commercial launch of Amtagvi™ for patients with previously treated advanced melanoma.*** Strong demand and growth are continuing and on track to accelerate for both Amtagvi and Proleukin® in 2025 and beyond in the U.S. and globally. Our top commercial priorities are to drive broader adoption and utilization, increase patient referrals, add large community practices to our authorized treatment center (ATC) network, expand the U.S. market, and secure regulatory approvals in three new markets outside the U.S. I am confident that Iovance is well positioned to remain the global leader in innovating, developing, and delivering current and future generations of TIL cell therapy for patients with cancer."

**Fourth Quarter Updates and Year to Date 2024 Financial Results, Corporate Guidance and Updates**

**Product Revenue and Guidance**

- Fourth Quarter 2024 Total Product Revenue: Iovance recognized total revenue of $73.7 million from sales of Amtagvi and Proleukin during the fourth quarter ended December 31, 2024.

o **Amtagvi Revenue:** Product Revenue was $48.7 million from U.S. Amtagvi sales in the fourth quarter of 2024, reflecting strong adoption with increasing demand. Amtagvi revenue is recognized upon patient infusion.

o **Proleukin Revenue:** Product revenue also included $25.0 million of Proleukin sales in the fourth quarter of 2024. Proleukin is used in the Amtagvi treatment regimen and other commercial and clinical settings. Proleukin revenue is recognized upon delivery to distributors and ATCs and purchased several months in advance of anticipated infusions an Amtagvi revenue recognition.

        *                    *                    *

- **Full Year 2025 Total Product Revenue:** Total product revenue was $164.1 million and achieved the high end of the company's guidance range of $160 to $165 million for the full year 2024. Full year product revenue included the first three quarters of sales following the U.S launch of Amtagvi on February 20, 2024. The full year 2024 product revenue for Amtagvi and Proleukin was $103.6 million and $60.5 million, respectively.

- ***Significant Amtagvi Growth Potential at Approximately 70 ATCs in 2025:*** *Amongst current ATCs, 76% completed tumor resections, 64% infused one or more patients, and 13% infused more than 10 patients, highlighting significant growth potential at existing ATCs.*

- ***Full Year 2025 Total Product Revenue Guidance:*** *Iovance is reaffirming total product revenue guidance within the range of $450 to $475 million for 2025, the first full calendar year of Amtagvi sales.* Amtagvi adoption is on track to continue accelerating throughout 2025 with broader utilization, higher demand, and growth in the community referrals. Iovance also expects significant growth in total product revenue for full year 2026 and beyond.

- Gross margins are expected to increase over time and remain on track to surpass 70% over the next several years. In line with anticipated growth in Amtagvi demand, Proleukin revenue is also expected to increase

significantly in 2025 and beyond.

                    \*                          \*                          \*

**Amtagvi (Lifileucel) U.S. Launch Highlights in Advanced Melanoma**

- The U.S. FDA approved Amtagvi (lifileucel) on February 16, 2024, as the first treatment option for patients with advanced melanoma after anti-PD-1 and targeted therapy. Amtagvi is the first FDA approved T cell therapy for a solid tumor indication.

- Approximately 70 U.S. ATCs are active across 32 states and 95% of addressable patients live within 200 miles of an ATC. Additional U.S. ATCs will be added steadily throughout, focusing on quality ATCs with a high volume of eligible patients, including large community practice ATCs.

- Community referral activities ae increasing throughout the U.S. to drive additional patient volume to these ATCs. Large community practices are currently onboarding, creating new and significant opportunity for more patients to receive Amtagvi after frontline therapy.

- Manufacturing turnaround time has been on target, with launch expectations of approximately 34 days from inbound to return shipment with ATCs. With efforts underway, turnaround time is expected to be reduced in the near term. The commercial manufacturing experience is consistent with prior clinical experience.

     97.    The same day, Iovance hosted an earnings call with analysts and investors to discuss its fourth quarter financial results. During the call, Defendant Vogt spoke on the Company's projections, stating, in relevant part:

> Today, I'm pleased to highlight continued growth in total product revenue for both Amtagvi and Proleukin. Total project revenue was $73.7 million for the fourth quarter and $164.1 million in the full year 2024. Importantly, our full year revenue achieved the upper end of our 2024 guidance range of $160 million to $165 million, and we finished above the full year Street consensus. Total revenue consisted of $48.7 million for Amtagvi and $25.0 for Proleukin in the fourth quarter with $103.6 million for Amtagvi and $60.5 million for Proleukin in the full year period.

Our full year product revenue reflects more than 200 patients already treated with Amtagvi in the partial first year of launch. We are pleased with the robust initial update and increasing strong demand for Amtagvi as well as continuing momentum in global Proleukin sales. ***Our team's successful execution as well as the unmet need in advanced melanoma, high awareness, broad patient access and a motivated expanding network of authorized treatment centers or ATC continue to drive increasing demand for Amtagvi and Proleukin.***

Our manufacturing network is well prepared to supply the current and anticipated demand for Amtagvi. Today, we have staffed capacity to supply more than 1,200 patients per year and continue to scale up for additional U.S. and global launch growth. In the back half of last year, we augmented our investment in focused community referral initiatives. ***These efforts in the field are targeted at driving additional demand in our ATCs, as they scale up to treat more patients.***

***Looking ahead, we are reiterating our full year 2025 guidance of $450 million to $475 million in total product revenue. We expect a significant increase in year-over-year growth in both Amtagvi and Proleukin, as ATCs broaden utilization, while new ATCs as well as community referral networks are expected to contribute increasing demand through the year.***

98.    Defendant Kirby then detailed the Company's expectation for ATC network growth in 2025, stating the following, in relevant part:

***Throughout 2024, we scaled up our ATC network to meet the growing patient demand and fulfill significant interest among health care providers to offer Amtagvi to their patients.*** After launching with an unprecedented ***30 ATCs on day 1***, we reached our target of approximately ***70 ATCs at the end of 2024***. Our ATC network now spans 32 states and nearly all treated melanoma patients live within a 2-hour drive of the closest center.

***We treated more than 200 patients with commercial Amtagvi within the first 3 quarters of launch, and Amtagvi is positioned for significant growth across our ATC network in 2025 and beyond.***

Amongst the 70 current ATCs, 76% completed tumor resections, 64% infused Amtagvi, 53% infused 2 or more patients and 13% infused more than 10

patients. These metrics demonstrate significant growth potential, as our ATCs scale up to accommodate growing patient demand.

New ATCs are preparing to treat initial patients. ***Our more experienced ATCs are steadily growing or plan to increase utilization throughout 2025, and we expect new ATCs will follow similar trends, as we add steadily throughout 2025.*** These additional ATCs will be selected for high quality and volume of eligible patients, including large community practices.

***To further drive adoption, earlier patient identification and higher referral volume into our ATC network, Iovance field teams are actively engaging top community oncologists and large community practices with a focus on high volume markets.*** Additionally, we are aligned with leadership at key community organizations on their preferred ATCs for patient referrals. As more patients embark on their treatment journey, we are making steady progress to speed up the time to intact the infusion.

99.    Further, Defendant Bellemin highlighted the Company having reaffirmed its fiscal 2025 guidance, adding that Iovance "continue[s] to reiterate our prior total product revenue guidance within the range of $450 million to $475 million for the full year 2025."

100.    Later, Defendant Bilinsky spoke about the current and pending maintenance requirements facing the Company, stating:

Each of our facilities is currently required to schedule a brief annual maintenance, which entails a shot pause in production. I'm pleased to report that iCTC successfully completed annual maintenance and resumed production promptly at full volume with no issues. We expect the same positive outcome following the upcoming scheduled maintenance at our contract manufacturer.

101.    Defendants also elaborated on the Company's current growth trends during the question-and-answer segment of the call. Indeed, Defendants further discussed the Company's outlook for 2025 on the call, stating, in pertinent part:

<Q: Andrea R. Newkirk – Goldman Sachs Group, Inc. – Research Analyst>
Fred, on prior calls you've provided an update on the number of patients infused thus far in the quarter. Just wondering if you'd be willing to share

where you stand as of today? And then just remind us or help us understand what gives you the confidence that the range for full year '25, which was set when you're only 1 quarter into the launch is still intact.

<A: Frederick G. Vogt> Yes, sure, Andrea. We're not -- from -- in the press release and on the call, *we're not going to be providing the infusions right now*. We're not sure how useful that metric was to long investors. And as some of you know, *it's prone to overinterpretation*. We provide some different metrics this time around, including the potential for growth at the ATCs. *And that actually is a part of the answer to your second question, if you look at our press release and heard Dan's commentary, within the 70 ATCs that we have right now, only 13% of infused in more than 10 patients, which gives you a very good idea of the upside that we're expecting, the acceleration we're expecting in the second half and second quarter of 2025 here as we go through. So we still have confidence in those numbers because the growth curve for this type of product can accelerate quite a bit, and we see that happening across our ATC network right now. We see the potential for that in the ATCs*.

. . .

<Q: Colleen Margaret Kusy – Robert W. Baird & Co. Inc. – Senior Research Analyst> I understand you're not giving intra-quarter updates going forward, but since you did provide in 4Q. Can you speak, was there a slowdown in infusions in the back half of the quarter? And did you see any seasonality in 4Q?

<A: Frederick G. Vogt> Colleen, no, we don't see any seasonality. As Igor mentioned, we did have a manufacturing maintenance period there. So we have those kind of things in cell therapy. If you look at the launch curves for ABECMA, YESCARTA and CARVYKTI, you'll see there's little peaks and dips and valleys in those as things like that happen so -- but nothing in terms of a holiday seasonality. That's what you're asking.

. . .

<Q: Nicholas Lorusso – TD Cowen – Associate> This is Nick on for Tyler. Thinking about guidance -- 2025 guidance, is the potential price increase currently included in that guidance? And also, how should we think about the global ex-U.S. expansion having a potential impact on guidance?

Verified Shareholder Derivative Complaint

<A: Frederick G. Vogt> Yes. The price increase that's coming in April has been factored into that guidance for both Proleukin and Amtagvi. And right now, the guidance doesn't include any contribution from ex-U.S.

. . .

<Q: Lin Tsai – Jefferies LLC – Equity Analyst> Appreciate the updates, look forward to 2025. So a quick one is, in terms of the launch uptake, what exactly would you say is the bottleneck at this juncture? If it's not patient demand nor supply chain nor even beds at sites, *what is the gating factor to seeing an acceleration in sales for 2025 like you guided*?

<A: Frederick G. Vogt> So I think, *above all, the ATCs that are starting up now have to get their feet under them and get running*. We've got some ATCs that are performing very, very well right now. And we've got a lot more that are working their way up. I think in each ATC, there's a difference -- *each individual ATC has its own little bottlenecks or whatever it might be. Some of them have staffing issues, some of them have financial clearance challenges that we're helping out with. But all these things are pretty easily resolvable, and we've been able to show that a good portion of our ATCs can really fly right now, and we think we can get a lot more there pretty soon*. Dan, go ahead.

<A: Daniel G. Kirby> Sure. And Andrew, I think one thing to add on top of what Fred said regarding not really a bottleneck, but there's a process they go through. They have to make sure they operationally can do it again. We're the first TIL in the market. So there's a learning curve there. As you see, we said 13% have hit 10% or more, that number continues to grow*. So once they hit that wave where they understand how to use the product with it, then the lever really is to pull the referrals and drive more patients in there. And that's where we're working with the community, not only at the clinic level, but also the leadership level and the community to make sure that those centers are getting to see the most patients.*

**February 27, 2025 Form 10-K**

102.    Also on February 27, 2025, the Company filed its annual report on Form 10-K with the SEC to report its financial results for the full 2024 Fiscal Year (the "2024 10-K"). The 2024 10-K was signed by Defendants Vogt, Bellemin, Weiser, Maynard, Dukes, Rothbaum, Countouriotis, and Yarno. The 2024 10-K asserted the Company was

"executing the launch of Amtagvi." The 2024 10-K further purported to report "factors that **may** cause actual results, level of activity, performance or achievements to be materially different from the information expressed" including the Company's "ability to successfully commercialize Amtagvi" as well as "the number of ATCs [] onboard[ed] to administer" Amtagvi. In relevant part, the 2024 10-K stated:

> These statements involve risks, uncertainties and other factors that **may** cause actual results, level of activity, performance or achievements to be materially different from the information expressed or implied by these forward-looking statements.

>        *              *              *

> - Our ability to successfully commercialize Amtagvi™ (lifileucel) and Proleukin® (aldesleukin), and any other products and/or product candidates or which we obtain or have obtained FDA, EMA, or other regulatory approvals, including by the European Commission in the European Union, or the EU;

>        *              *              *

> ***In addition to marketing our product, we will need current and future ATCs both inside and outside the U.S. that are prepared and have the capacity and experience to administer our therapies to patients.*** Even if we are able to obtain approval for a product candidate in a country or region, we may not be able to approve enough treatment centers for the provision of our product to a broad patient population. ***The number of ATCs we onboard to administer our product may fluctuate and affect our product launch, and even if we onboard a large number of ATCs, this does not ensure the uptake of our products. Additionally, certain areas do not have hospitals with the facilities to safely administer our therapy.*** Accordingly, we may only be able to launch our products with a limited number of ATCs, which could ultimately reduce the uptake of our products. Although we have a team allocated to authorize and monitor our ATCs, substantial resources and investment from us and each treatment center may be required. Additionally, the treatment center onboarding process can be complicated and requires extensive training, technical equipment, and coordination of processes. Once authorized, ATCs

will be required to ensure that their training, facilities, and treatment capabilities are adequately maintained.

We have limited prior experience in the marketing, sale, and distribution of biopharmaceutical products, and there are significant risks involved in the building and managing of a commercial infrastructure. The establishment and development of commercial capabilities, including a comprehensive healthcare compliance program, to market any products we may develop will be expensive and time consuming and could delay any product launch, and we may not be able to successfully develop this capability. We, or our collaborators, will have to compete with other pharmaceutical and biotechnology companies to recruit, hire, train, manage, and retain marketing, sales, and commercial support personnel. Although we have developed a commercial infrastructure, in the event we are unable to continue to develop a successful commercial infrastructure, we may not be able to commercialize our current or future product candidates, which would limit our ability to generate product revenues.

### *March 13, 2025 Barclays 27th Annual Global Health Conference*

103.    On March 13, 2025, the Defendants presented at Barclays 27th Annual Global Healthcare Conference. At this event, Defendant Kirby discussed the Company's fiscal 2025 guidance during a question-and-answer session. In pertinent part, Defendant Kirby stated:

<Q: Peter Richard Lawson – Barclays Bank PLC – Research Analyst> … you've mentioned the product and the launch, just how should we think about the factors influencing guidance, what brings you to the top and bottom end of those ranges and what are the moving parts?

<A: Daniel G. Kirby> Sure. So the factors for the guidance really are our existing ATCs. We have 70 ATCs that are stood up right now. And of those, over 3/4 have done a tumor tissue procurement. Over 2/3 have done an actual infusion to a patient and over half of them have infused multiple patients, 13% are at that expert level of 10 plus. Our guidance really is about maximizing for this year their progress through that spectrum to keep treating more and more patients and to maximize the potential inside of those accounts.

We also simultaneously this year with the upper end, we have other initiatives

1
2
3
4
5

that are getting into the referral patterns with the community and looking at where they're sending patients, sending those to the expert accounts and standing up new ATCs where we know patients are flowing in. So that's the perspective on the guidance with it. We can do it with our existing ATCs, but we're also being opportunistic to see if we can get more volume of patients by increasing the referral patterns into them.

6

. . .

7
8
9

<Q: Peter Richard Lawson> … are things positioned where 1Q could show an acceleration of growth? Or is it more back-end loaded? How should we be thinking about it?

10
11
12
13
14

<A: Daniel G. Kirby> It's a great question. We don't want to talk about first quarter right now until we have the earnings call. But what I would say is if you look at our initiatives with the accounts that are ramping up, we're having more enter into that expert level of 10-plus infusions. And then the other ones are ramping along and progressing with it. We're expecting significant half of this year with it, but we do feel that it will be more of a yearly look than a quarterly look.

15
16
17
18
19
20
21
22

104.   The statements in ¶¶84-103 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the new ATCs were experiencing longer timelines to begin treating patients with Amtagvi; (2) the Company's sales team and new ATCs were ineffective in patient identification and patient selection for Amtagvi, leading to higher patient drop-offs; and (3) the foregoing dynamics led to higher costs and lower revenue because ATCs could not keep the pace with the manufactured product. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

23

**The Truth Emerges**

24
25
26
27
28

105.   The truth fully emerged on May 8, 2025, after the market closed, when the Company released its first quarter 2025 financial results, reporting a quarterly total product revenue of $49.3 million, a noteworthy decline from the prior quarter's $73.7 million. Iovance also announced its full fiscal year 2025 total product revenue guidance, which reduced the previous prediction of $450-$475 million to $250-$300 million, over 40% at

the midpoint. The Company also stated its intent to revise its full-year guidance to reflect the recent launch dynamics of Amtagvi. On this day, Iovance issued a press release stating, in relevant part:

### Iovance Biotherapeutics Reports Financial Results and Corporate Updates for First Quarter 2025

*1Q25 Total Product Revenue*

**FY25 Total Product Revenue Guidance Revised to $250M-$300M**

*FY25 Operating Expenses Reduced and 2H26 Cash Runway Guidance Maintained*

\*                               \*                               \*

Frederick Vogt, Ph.D., J.D., Interim President and Chief Executive Officer of Iovance, stated, "During the start of the new year, our first quarter revenue was impacted by a significant reduction in capacity during the annual scheduled maintenance at the Iovance Cell Therapy Center (iCTC). Since the full production has now resumed at the iCTC, we now expect infusions to grow in the second quarter as compared to the first quarter. ***Additionally, based on our experience to date, we are revising full-year revenue guidance to reflect recent launch dynamics.*** In the first 12 months of our U.S> launch, we have executed toward our long-term adoption goals by treating more than 275 Amtagvi patients and generating more than $210 million in revenue. Beyond the U.S. launch, we are on track this year for potential Amtagvi regulatory approvals in three new ex-U.S. markets as well as a clinical data update from our registrational trial in non-small cell lung cancer."

### First Quarter 2025 Financial Results, Corporate Guidance and Updates

**Product Revenue and Guidance**

- **First Quarter 2025 Total Product Revenue**: Iovance recognized total revenue of $49.3 million from sales of Amtagvi and Proleukin during the first quarter ended March 31, 2025.

    o **1Q25 Amtagvi Revenue:** Product revenue from U.S. Amtagvi

sales was $43.8 million, impacted by a reduction in capacity during annual scheduled maintenance at the iCTC. Production has resumed enabling full capacity for infusions in the second quarter of 2025. Iovance currently anticipates infusing between 100 and 110 commercial patients in the second quarter.

o **1Q25 Proleukin Revenue:** Product revenue also included $5.7 million in Proleukin sales, primarily reflecting clinical and manufacturing use after stocking at major U.S. wholesalers in 2024. Significant orders are expected in the current quarter. Proleukin is used in the Amtagvi treatment regimen and other commercial, clinical, manufacturing, and research settings, which provide additional revenue.

\*　　　　　\*　　　　　\*

- **Amtagvi Growth Potential at U.S. ATCs in 2025:** As of today, Iovance's treatment network of more than 80 ATCs includes an initial wave of 70 ATCs and more than 10 ATCs in process to become a second wave. Fifty-six ATCs completed tumor resections, 48 infused one or more patients, and 11 infused more than 10 patients. These trends highlight growing adoption and significant growth potential. Several new ATCs are expected to treat their first patients in the remaining weeks of the second quarter of 2025.

- **Full Year 2025 Total Product Revenue:** *Iovance is revising total product revenue guidance within the range of $250 to $200 million in the first full calendar year of Amtagvi sales. The updated forecast considers experience with ATC growth trajectories and treatment timelines for new ATCs.* Beyond ATCs, large community practices are expected to expand market opportunity. Amtagvi adoption will accelerate in 2025 with broader utilization and higher demand. Proleukin sales are also expected to accelerate throughout the remainder of 2025 with restocking to U.S. distributors and sales growth to manufacturers and for other clinical and manufacturing uses. Iovance expects significant growth in total product revenue for full year 2026 and beyond. Gross margins are expected to increase over time and remain on track to surpass 70% over the next several years.

106.   Also on May 8, 2025, the Company held a conference call with analysts and

investors to discuss its first quarter 2025 financial results. During the call, Defendant Vogt elaborated on the quarter's underperformance for Iovance and attributed the revenue decline to three factors, including "the variable pace at which ATCs began treating patients," which "differs from center to center." Defendant Vogt explained, in relevant part:

First, our internal manufacturing facility, ***the iCTC completed annual scheduled maintenance in December*** of last year, as we previously discussed on last quarter's call.

As a result of limited production starts for multi-week Amtagvi manufacturing across our network, ***capacity was reduced by more than half for about 1 month***. In addition, volume was impacted by higher rates of patient drop-off and lower manufacturing success rates, but has since rebounded. Today, we are seeing healthy demand with a record number of production starts in the second quarter.

***Lower Proleukin sales were the second factor*** contributing to lower first quarter revenue. We expect 2 of the 3 largest U.S. [ship] wholesalers to start replenishing Proleukin in line with growing Amtagvi demand in the second quarter.

We're also growing the other components of our franchise, including sales of Proleukin to third parties for use with manufacturing and clinical research.

***The third contributor to first quarter revenue was the variable pace at which ATCs began treating patients and this differs from center to center***. For context, 16% of ATCs have treated more than 10 patients. Our ATCs have ample room to grow, and we anticipate near-term contributions from ATCs that came online in the latter half of 2024 into 2025.

107.   Further, in response to an analyst's question, Defendant Vogt elaborated:

Back in August, we were trying to give investors our best line of sight to what we thought was going to happen. At that point, we were very well aware of the high demand for the product, and we were ramping up our manufacturing as fast as we could. So, we built our model on the back of how many manufacturing slots we would make available maximum ramp.

Now, as we've gone, we've learned a lot about the launch, especially recently

as we watch some of the dynamics with the ATCs, we looked at our experience with growth trajectories there. We look at the time lines it takes for new ATCs to come on board and begin treating their first patients and how they work through their processes. We're onboarding these large community practices, which takes some time, and we're doing the community referral process, which takes a lot of time, too.

And as we looked at that, we just decided that it was better and more accurate for us to forecast guidance that we gave today to show you that we can still make this product grow very, very substantially.

But now what we're going to do is we're just going to limit some of our manufacturing slots. It ends up being essentially almost a neutral with respect to how we use our cash, and we'll roll forward and we'll continue to succeed on the launch. But we think we'll do it on terms that are, I think, a little bit more in line with what we actually see at the ATCs.

108.  Defendant Bellemin stated that "[c]osts of sales in the first quarter of 2025 was $49.7 million, including $15 million in period costs associated with patient drop-off and manufacturing success rates, and increase quarter-over quarter." When asked what drove the higher patient drops or lower manufacturing success in the quarter by an analyst, Defendant Bilinsky replied, "Some of this – or much of this – is related to patient selection and the tumor procurement technique . . . What gives us confidence in the success rate trends that we see among ATCs who have been up and running for a long time and the experience curve that they've been able to achieve."

109.  The aforementioned press release and statements made by the Individual Defendants directly contradict statements they made during the August 9, 2024, November 7, 2024, February 27, 2025, and March 13 2025 earnings and shareholder calls. Indeed, during these calls, Defendants misleadingly praised the Company's alleged growth, the unmet demand and significant awareness for their treatment, the rapid expansion and adoption of the Company's ATCs for Amtagvi and Proleukin, and how those ATCs were able to drive demand for Iovance's infusions. What the Defendants materially misrepresented and failed to account for was the potential for a demand plateau or the

ability of the ATC to scale at the rapid pace assured by Defendants.

110.  On this news, the price of the Company's stock fell $1.42 per share, or approximately 44.8%, from a closing price of $3.17 per share on May 8, 2025 to close at $1.75 per share on May 9, 2025.

## DAMAGES TO IOVANCE

111.  As a direct and proximate result of the Individual Defendants' conduct, Iovance has lost and will continue to lose and expend many millions of dollars.

112.  Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Actions, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

113.  Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

114.  Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

115.  Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

116.  As a direct and proximate result of the Individual Defendants' conduct, Iovance has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

117.   Plaintiffs bring this action derivatively and for the benefit of Iovance to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Iovance, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

118.   Iovance is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

119.   Plaintiffs are, and have been at all relevant times, shareholders of Iovance. Plaintiffs will adequately and fairly represent the interests of Iovance in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

120.   Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

121.   A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Iovance's Board consisted of the following seven individuals: Defendants Vogt, Dukes, Countouriotis, Maynard, Rothbaum, Weiser, and Yarno (the "Director-Defendants"). Plaintiffs need only to allege demand futility as to four of the seven Director-Defendants that were on the Board at the time this action was filed.

122.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

123.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Iovance to issue materially false and

misleading statements. Specifically, the Director-Defendants caused Iovance to issue false and misleading statements which were intended to make Iovance appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

124.    Additional reasons that demand on Defendant Vogt is futile follow. Defendant Vogt has served as Interim CEO and President of Iovance since June 2021. He has also served as General Counsel of Iovance since July 2017 and as a director of Iovance since June 2024. The Company provides Defendant Vogt with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer and an influential member of the Board, Defendant Vogt was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including those which he personally made. In addition, he signed the false and misleading 2024 10-K and certified accompanying SOX certifications regarding the same. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Vogt is named as a defendant in the Securities Class Actions. For these reasons, Defendant Vogt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

125.    Additional reasons that demand on Defendant Dukes is futile follow. Defendant Dukes has served as Chairman of the Board since August 2016. He also serves as the Chair of the Nominating and Corporate Governance Committee. Defendant Dukes has received and continues to receive handsome compensation for his role as a director. As

a Company director, Defendant Dukes also signed the false and misleading 2024 10-K. As the trusted Chairman of the Company's Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Dukes breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

126.    Additional reasons that demand on Defendant Countouriotis is futile follow. Defendant Countouriotis has served as a Company director since June 2019. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Countouriotis has received and continues to receive handsome compensation for her role as a director. As a Company director, Defendant Countouriotis also signed the false and misleading 2024 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Countouriotis breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

127.    Additional reasons that demand on Defendant Maynard is futile follow. Defendant Maynard has served as a Company director since February 2015. He also serves as the Chair of the Audit Committee. Defendant Maynard has received and continues to receive handsome compensation for his role as a director. As a Company director, Defendant Maynard also signed the false and misleading 2024 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make

false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Maynard's insider sales, made while the Company's stock price was artificially inflated as a result of the false and misleading statement alleged herein, further demonstrate his motive in facilitating and participating in the scheme. For these reasons, Defendant Maynard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128.    Additional reasons that demand on Defendant Rothbaum is futile follow. Defendant Rothbaum has served as a Company director since June 2016. He also serves as a member of the Compensation Committee and Scientific Committee. Defendant Rothbaum has received and continues to receive handsome compensation for his role as a director. As a Company director, Defendant Rothbaum also signed the false and misleading 2024 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Rothbaum breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.    Additional reasons that demand on Defendant Weiser is futile follow. Defendant Weiser has served as a Company director since March 2018. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee, Nominating and Corporate Governance Committee, and Scientific Committee. Defendant Weiser has received and continues to receive handsome compensation for his role as a director. As a Company director, Defendant Weiser also signed the false and misleading 2024 10-K. As a trusted Company director, he conducted little, if any, oversight of the

scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Weiser breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

130. Additional reasons that demand on Defendant Yarno is futile follow. Defendant Yarno has served as a Company director since June 2023. She also serves as a member of the Audit Committee. Defendant Yarno has received and continues to receive handsome compensation for her role as a director. As a Company director, Defendant Yarno also signed the false and misleading 2024 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Yarno breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

131. Additional reasons that demand on the Board is futile follow.

132. Defendants Maynard (as Chair), Weiser, and Yarno (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and

risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

133.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

134.    Iovance has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Iovance any part of the damages Iovance suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

135.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions

challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

136.    The acts complained of herein constitute violations of fiduciary duties owed by Iovance's officers and directors, and these acts are incapable of ratification.

137.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if there is a directors' and officers' liability insurance policy covering the Director-Defendants. The policy may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Iovance, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

138.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Iovance to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

139.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

140.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

141.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Iovance's business and affairs.

142.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

143.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Iovance.

144.    In breach of their fiduciary duties owed to Iovance, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the new Authorized Treatment Centers were experiencing longer timelines to begin treating patients with Amtagvi; (2) the Company's sales team and new ATCs were ineffective in patient identification and patient selection for Amtagvi, leading to higher patient drop-offs; and (3) the foregoing dynamics led to higher costs and lower revenue because the ATCs could not keep pace with the manufactured product. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

145.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

146.    Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

147.    In yet further breach of their fiduciary duties, during the Relevant Period, one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $503,000.

148.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Iovance's securities.

149.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Iovance's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

150.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

151.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Iovance has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable

to the Company.

152.   Plaintiffs, on behalf of Iovance, have no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

153.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

154.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Iovance.

155.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Iovance that was tied to the performance or artificially inflated valuation of Iovance or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

156.   Plaintiffs, as shareholders and representatives of Iovance, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

157.   Plaintiffs, on behalf of Iovance, have no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Abuse of Control

158.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

159.   The Individual Defendants' misconduct alleged herein constituted an abuse of

their ability to control and influence Iovance, for which they are legally responsible.

160. As a direct and proximate result of the Individual Defendants' abuse of control, Iovance has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

161. Plaintiffs, on behalf of Iovance, have no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

162. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

163. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Iovance in a manner consistent with the operations of a publicly held corporation.

164. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Iovance has sustained and will continue to sustain significant damages.

165. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

166. Plaintiffs, on behalf of Iovance, have no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

167. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

168. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

169. As a result of the foregoing, and by failing to properly consider the interests

of the Company and its public shareholders, the Individual Defendants have caused Iovance to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

170.  As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

171.  Plaintiffs, on behalf of Iovance, have no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Vogt, Bellemin, Bilinsky, and Kirby for Contribution Under Sections 10(b) and 21D of the Exchange Act

172.  Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

173.  Iovance and Defendants Vogt, Bellemin, Bilinsky, and Kirby are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Vogt's, Defendant Bellemin's, Defendant Bilinsky's, and Defendant Kirby's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

174.  Defendants Vogt, Bellemin, Bilinsky, and Kirby, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

175.  Accordingly, Defendants Vogt, Bellemin, Bilinsky, and Kirby are liable under

15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

176.    As such, Iovance is entitled to receive all appropriate contribution or indemnification from Defendants Vogt, Bellemin, Bilinsky, and Kirby.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Iovance, and that Plaintiffs are adequate representatives of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Iovance;

(c)    Determining and awarding to Iovance the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Iovance and the Individual Defendants to take all necessary actions to reform and improve Iovance's corporate governance and internal procedures to comply with applicable laws and to protect Iovance and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Iovance to nominate at least four

candidates for election to the Board;

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Iovance restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: June 5, 2025                    Respectfully submitted,

                                       **THE BROWN LAW FIRM, P.C.**

                                       */s/*Robert C. Moest_____
                                       Robert C. Moest, Of Counsel, SBN 62166
                                       2530 Wilshire Boulevard, Second Floor
                                       Santa Monica, CA 90403
                                       Telephone: (310) 915-6628
                                       Facsimile: (310) 915-9897
                                       Email: RMoest@aol.com

                                       **THE BROWN LAW FIRM, P.C.**
                                       Timothy Brown
                                       767 Third Avenue, Suite 2501
                                       New York, NY 10017
                                       Telephone: (516) 922-5427
                                       Facsimile: (516) 344-6204
                                       Email: tbrown@thebrownlawfirm.net

                                       *Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

## **VERIFICATION**

I, Samhita Gera, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th day of June, 2025.

DocuSigned by:

CF385B635442498...

Samhita Gera

## **<u>VERIFICATION</u>**

I, Denish Bhavsar, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th day of June, 2025.

DocuSigned by:

*Denish Bhavsar*

925939D77A464FC...

Denish Bhavsar